PEOPLE v ANDERSON (AFTER REMAND)

Docket No. 95406. Argued January 12, 1994 (Calendar No. 8). Decided August 26, 1994. Certiorari denied by the Supreme Court of the United States on February 21, 1995, 513 US — (1995).

James K. Anderson, III, was convicted by a jury in the Kalkaska Circuit Court, Alton T. Davis, Jr., J., of first-degree criminal sexual conduct involving his minor daughter. The Court of Appeals, DOCTOROFF, P.J., and MAHER, J. (CAVANAGH, J., concurring), affirmed in an unpublished opinion per curiam, holding that no Sixth Amendment violation of the right to counsel occurred in permitting a detective to testify about the defendant's postarraignment statement that he had sexual thoughts about his daughter, and that admission of a social worker's testimony pursuant to MRE 803(4), recounting the complainant's statements describing the alleged sexual conduct, although hearsay, was harmless (Docket No. 120714). In lieu of granting leave to appeal, the Supreme Court remanded the case to the Court of Appeals to consider the defendant's statement to the detective in light of People v Bladel (After Remand), 421 Mich 39 (1984), and to determine whether admission of that statement and the hearsay testimony of the social worker was harmless error. 439 Mich 1000 (1992). On remand, the Court of Appeals, DOCTOROFF, C.J., and BRENNAN, J. (CAVANAGH, J., dissenting), once again affirmed in an unpublished opinion per curiam, presuming a Sixth Amendment violation, but deeming that error, as well as the admission of the hearsay testimony, to be harmless (Docket No. 152135). The Supreme Court initially denied leave to appeal, 442 Mich 908 (1993), but, on reconsideration, granted leave, 444 Mich 875 (1993), and, while retaining jurisdiction, remanded the case to the trial court for an evidentiary hearing regarding the defendant's Sixth Amendment right to counsel in light of Michigan v Jackson, 475 US 625 (1986), and Patterson v Illinois, 487 US 285 (1988), to determine whether the defendant initiated postarraignment communications with the police, and, if so, whether he waived his right to counsel. On remand, the trial court found that the defendant initiated postarraignment communication and waived his right to counsel. The defendant appeals.

In a unanimous opinion by Justice RILEY, the Supreme Court held:

The admission of a postarraignment statement by the defen-

dant to the detective violated his Sixth Amendment right to counsel. Moreover, that admission was a harmful error requiring reversal.

1. The Sixth Amendment right to counsel attaches and represents a critical stage only at or after the initiation of formal adversary judicial proceedings; however, the right is invoked only by requesting counsel, usually at postcharge questioning or at arraignment. Thereafter, the police may not conduct further interrogations of the accused without the presence of counsel, unless the accused initiates further communications. In this case, the defendant was arraigned and invoked his right to counsel at his arraignment. Because the defendant did not initiate any further communication postarraignment, his subsequent statement to the detective in response to further police questioning was admitted in violation of his Sixth Amendment right to counsel.

2. Under federal law, if an error is a structural defect in the constitution of the trial mechanism that defies analysis under harmless-error standards, automatic reversal is required. However, where an error occurs during the presentation of the case to the jury, it is subject to harmless-error analysis, requiring the beneficiary of the error to prove, and the court to determine, beyond a reasonable doubt that there was no reasonable possibility that the challenged evidence might have contributed to the conviction.

3. In this case, the error occurred during presentation of the case to the jury. Applying the federal harmless-error test, it was not harmless beyond a reasonable doubt.

Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Mark S. Mackley,* Prosecuting Attorney, and *J. Ronald Kaplansky,* Assistant Attorney General, for the people.

*Jeanice Dagher-Margosian* for the defendant.

### AFTER REMAND

Riley, J. In this case, we are called upon first to determine whether admission of a postarraign-

ment statement by the defendant violated his Sixth Amendment right to counsel and, second, if it was a violation, whether the admission of this statement and the admission of certain hearsay statements in violation of MRE 803(4) can be deemed harmless errors. With regard to the post-arraignment statement, we find that it was admitted in violation of defendant's Sixth Amendment right to counsel. Moreover, we are not persuaded that this error was harmless and therefore reverse the opinion of the Court of Appeals and remand to the trial court for proceedings consistent with this opinion. In light of this holding, however, we do not find it necessary to independently review whether the hearsay admissions were also harmful.

## I. FACTS AND PROCEDURAL HISTORY

Defendant was charged with first-degree criminal sexual conduct, MCL 750.520b; MSA 28.788(2), for allegedly engaging in certain sexual acts with his nine-year-old daughter. On February 10, 1989, a Kalkaska County jury found defendant guilty as charged, and he was sentenced to fifty to seventy-five years in prison.

The crucial testimony at trial came from the complainant, Detective Bruce Gaultier, social worker Barbara Cross,[1] and defendant.[2] Complain-

[1] Complainant first came in contact with Ms. Cross after her mother and stepfather discovered that her two stepbrothers were sexually molesting her. During a counseling session with Ms. Cross, complainant stated that defendant also molested her. Ms. Cross immediately informed the authorities after which she continued counseling complainant with these later sessions producing the inadmissible hearsay testimony at issue in the instant case.

[2] The remaining witnesses did not testify regarding any acts of sexual abuse by defendant.

First, complainant's mother testified about the sexual abuse by complainant's stepbrothers, thereby explaining the need for counsel-

ant testified first and stated that the sexual abuse occurred when she visited defendant,[3] her natural father, at Sue Rebone's home during Christmas vacation. Although she testified regarding several occasions of sexual abuse, complainant only specifically discussed the sexual acts of one night.[4]

The alleged sexual conduct occurred at the end of the evening, after complainant retired to sleep in one bedroom, Ms. Rebone to another, with defendant remaining on the living-room couch. During the night, defendant allegedly entered complainant's bedroom wearing just his underwear. Complainant indicated that he then pulled down his underwear, pulled down her underwear, and raised her nightgown. She then testified to two specific sexual acts during which defendant

ing with Ms. Cross. She also explained why these initial allegations were not relayed to defendant, her natural father.

Second, Dr. Douglas Newman, the family physician, testified about complainant's frequent urinary and vaginal infections, as well as bedwetting. Although Dr. Newman did not notice anything unusual with her hymen, he indicated that the insertion of a tongue, penis, or finger could leave the hymen intact. Similarly, the use of vaseline into the anus might cover any visible effects. Dr. Newman also indicated that the urinary infections could have been caused by vaginal irritation or masturbation. In fact, Dr. Newman stated that complainant's mother reported her frequent masturbation. Nonetheless, he did not testify regarding any physical evidence of sexual abuse or actual knowledge of sexual abuse.

The remaining witness was defendant's character witness, Lisa Trobaugh, a friend of defendant. She testified that defendant had lived with her and her husband at their home for several years, where complainant often visited the defendant. Ms. Trobaugh stated, however, that complainant and defendant never slept in the same room together and that complainant never appeared upset on these visits.

Accordingly, the only testimony regarding the specific sexual acts came from complainant, Ms. Cross, and Detective Gaultier. Defendant denied every allegation.

[3] At the time of the alleged sexual conduct, complainant was living with her mother and stepfather. It was at this residence that complainant's stepbrothers sexually molested her.

[4] On this night, defendant, Ms. Rebone, and complainant viewed two children's videos and one adult video. During this time, defendant allegedly became intoxicated from drinking vodka.

inserted his finger into her vagina[5] and anus.[6] Each time complainant told defendant to stop because she knew it would hurt.[7] Aside from these two specific sexual references, complainant alluded to defendant inserting his penis in her, but did not explain where he inserted his penis or when this occurred.[8] However, she was certain that it did not occur on the same night as the above two sexual acts.

Both Detective Gaultier and Ms. Cross corroborated these two acts and testified about other, additional sexual acts spanning, in some cases, years. Detective Gaultier testified first. However, before testifying, the trial judge conducted a mid-

[5] Complainant specifically stated that defendant inserted his pinkie into her vagina. Complainant then explained that she knew it was his pinkie because he had done this on previous occasions.

[6] Complainant described this later event in detail by stating that defendant instructed her to roll over upon which defendant rubbed vaseline all over her buttocks. Defendant then inserted his finger, although she did not specify which finger as she had done in regard to her vagina.

[7] Defendant eventually fell asleep and then "wet" the bed. Complainant explained that defendant often wets the bed when he has been drinking. In fact, she indicated that he had wet her bed on other occasions.

[8] There were two points in the record where the prosecutor tried to elicit testimony from complainant regarding conduct involving defendant's penis:

> *Q.* Now do you remember your dad trying to do anything with his penis that night?
> *A.* No.
>
> * * *
>
> *Q.* Now you said your dad had done things to you before, is that true?
> *A.* Yes.
> *Q.* Things like he did this night?
> *A.* Yes.
> *Q.* Okay, has he ever tried to put his penis in you?
> *A.* Yes.
> *Q.* Do you remember when the last time was?
> *A.* No.

trial evidentiary hearing to determine the admissibility of certain statements[9] made to Detective Gaultier. The statement crucial to this appeal is defendant's admission that he had sexual thoughts about his daughter, but would immediately clear them from his mind. This statement occurred in a police car when defendant was returning from taking a polygraph examination in another city. At the evidentiary hearing, Detective Gaultier testified that defendant received and waived his *Miranda*[10] rights one hour earlier at the polygraph examination. Also, before obtaining this statement in the patrol car, Detective Gaultier "asked [defendant] if he was familiar with his *Miranda* rights that he had previously waived earlier that day?" On the basis of defendant's *Miranda* waiver, the judge admitted the statement.[11]

After the jury returned, Detective Gaultier related this statement to the jury. On cross-examination, however, defense counsel presumably attempted to mitigate the prejudice of the statement by eliciting from Detective Gaultier defendant's denial of each of the following allegations: (1) attempting to insert his penis into complainant's vagina, (2) inserting his tongue into her vagina, and (3) putting his penis in her mouth.[12] On redirect examination, the prosecutor, without objection by defense counsel, essentially elicited a detailed recount of every allegation recorded by Detective

[9] The judge considered the admission of three statements, the first two of which are not subject to this appeal.

[10] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[11] The judge also held that the statement could "be reasonably construed to be an admission against his interests under the exception of the hearsay rule, 804[b](3)."

[12] Complainant did not previously testify about any of these allegations, but simply alluded to conduct involving defendant's penis. See n 8.

Gaultier from his conversations with complainant.[13]

The prosecutor then emphasized this testimony in closing argument:

Mr. Gaultier . . . was able to list and reiterate from a conversation with [complainant] . . . every single [thing] that you found out today. *It's interesting, ladies and gentlemen. Detective Gaultier testified to you that when he was speaking with the defendant, the defendant admits to him he has sexual thoughts about his nine-year-old daughter. That's a very specific descriptive term, sexual thoughts.* [Emphasis added.]

Following Detective Gaultier's testimony, Ms. Cross confirmed some of the allegations when testifying as an expert in psychiatric social work about the following:[14]

During that session specifically what she told me was that he tried to stick it in her, is the way she put it. That he put his pinkey [sic] in her, and she was referring to her vaginal area.

\* \* \*

She told me that her dad had put his penis in her mouth; that he had put vaseline all over her vagina; all over her butt; that he asked her to do the same thing to him and that she had; and she was real upset telling me that, because she felt so

---

[13] This testimony consisted of the complainant (1) describing defendant's penis in the erect position and defendant forcing her to rub his penis, (2) defendant rubbing her vagina with his hand, (3) describing the taste of urine and semen as sour, (4) describing the pain she felt when defendant attempted to insert his penis in her vagina, and (5) describing similar events aside from the one night in January, including when the family lived in other states, and also the previous year when she was in second grade.

[14] Ms. Cross began to explain what specific sexual acts transpired when defense counsel objected to this testimony as hearsay. The trial judge overruled his objection and allowed her to testify on the basis of MRE 803(4)'s medical treatment exception to the hearsay rule.

> guilty and so bad; she told me that he had put his mouth on her vagina; that he had tried to stick it in her; that he had touched her breasts; and that he had told her not to tell anyone or she'd be in trouble if she did.

After the prosecution presented its case, defendant testified and denied all these allegations. He even stated that he did not recall complainant's visit to Ms. Rebone's home on the date in question and suggested that complainant was lying.[15] Nevertheless, the jury convicted defendant as charged.

Defendant appealed in the Court of Appeals, raising several claims of error,[16] only two of which are pertinent to this Court's review: (1) defendant's claim that it was error requiring reversal to permit Detective Gaultier, in violation of defendant's Sixth Amendment right to counsel, to testify about defendant's statement that he had sexual thoughts about his daughter, and (2) defendant's contention that it was error requiring reversal to allow Ms. Cross, pursuant to MRE 803(4)'s medical treatment hearsay exception, to recount complainant's statements describing the alleged sexual conduct. On September 9, 1991, the Court of Appeals affirmed in an unpublished opinion per curiam (Docket No. 120714), holding that there was no Sixth Amendment violation, but finding Ms. Cross' testimony hearsay but harmless.

In lieu of granting leave to appeal, this Court remanded the case[17] to the Court of Appeals to

---

[15] Defendant denied that he ever rents adult videos and, regardless, would never allow his daughter to view them.

[16] Defendant claimed that the trial court erred in finding complainant competent to testify, in admitting testimony of other instances of sexual relations between him and the complainant, and in instructing the jury. Defendant also alleged that certain prosecutorial misconduct denied him a fair trial. These claims of error were not pursued in this appeal, and we therefore express no opinion in regard to their merit.

[17] 439 Mich 1000 (1992).

consider defendant's statement to Detective Gaultier in light of *People v Bladel (After Remand)*, 421 Mich 39; 365 NW2d 56 (1984), and to determine whether that statement and the hearsay testimony of Ms. Cross were harmless errors.

On remand, in a split decision, the Court of Appeals affirmed the conviction, presuming[18] a Sixth Amendment violation, but deeming this error, as well as the hearsay testimony, harmless. Judge CAVANAGH dissented, reasoning that the errors were not harmless.

Defendant again sought leave to appeal in this Court, which was denied on May 14, 1993.[19] On motion for reconsideration, however, this Court granted leave to appeal.[20] After granting an opportunity for full briefing and argument, this Court, while retaining jurisdiction, ordered a remand to the trial court for an evidentiary hearing regarding defendant's Sixth Amendment right to counsel claim in light of *Bladel, supra,* aff'd sub nom *Michigan v Jackson,* 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986), and *Patterson v Illinois,* 487 US 285; 108 S Ct 2389; 101 L Ed 2d 261 (1988).[21] Specifically, we ordered the court to determine

[18] The Court of Appeals stated:

Upon examination of the record, we conclude that there is insufficient evidence to determine conclusively whether defendant waived his Sixth Amendment right to counsel prior to giving the statement at issue. Due to the inadequate development of the record, we presume that defendant did not waive his Sixth Amendment rights and therefore the statement at issue was taken in violation of those rights. Notwithstanding our presumption that the statement was taken in violation of defendant's Sixth Amendment right to counsel, we hold that the error was harmless beyond a reasonable doubt. [Unpublished opinion per curiam, issued November 23, 1992 (Docket No. 152135).]

[19] 442 Mich 908 (1993).
[20] 444 Mich 875 (1993).
[21] 444 Mich 975 (1994).

whether defendant initiated further communications with the police by requesting a polygraph examination, and, if so, whether defendant waived his right to counsel at both the polygraph examination and in the patrol car.

On remand, three witnesses testified, the most pertinent of whom was Detective Gaultier. He clarified the factual development regarding his initial contact with defendant, defendant's arrest and arraignment, and the arrangements for the polygraph examination. Detective Gaultier testified that before attending the polygraph examination, defendant had been arraigned and requested counsel.[22] Apparently, defendant requested a polygraph examination during an initial interview with Detective Gaultier, *before* his arrest and arraignment, at which time Detective Gaultier indicated that he would make the arrangements and provide transportation if needed. *After* being arraigned, appointed counsel, and released on bond, Detective Gaultier contacted defendant regarding the polygraph examination by leaving a message at defendant's residence. Upon receiving the message, defendant contacted Detective Gaultier and accepted his offer to provide transportation. At the examination, the polygraph examiner obtained defendant's waiver of his *Miranda* rights by way of a standard waiver form. Moreover, Detective Gaultier reaffirmed defendant's waiver of his *Miranda* warnings before obtaining the contested statement by asking him whether he remembered his rights being read to him earlier in the day.

On the basis of this information, the trial judge

[22] At the midtrial evidentiary hearing, Detective Gaultier testified that he was unaware whether counsel was appointed. On remand, however, Detective Gaultier seemed to indicate that he was aware that counsel was appointed.

opined that defendant·initiated the request for the polygraph examination and properly waived his right to counsel, both at the examination and in the patrol car. Because this Court retained jurisdiction in this matter, the case is again before this Court.

## II. SIXTH AMENDMENT RIGHT TO COUNSEL

We turn first to defendant's claim that the trial court erroneously admitted a statement in violation of his Sixth Amendment right to counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The right to counsel attaches and represents a critical stage "only at or after the initiation of adversary judicial proceedings against the accused by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *Bladel, supra* at 52. However, the right is invoked only by requesting counsel, usually at postcharge questioning or at arraignment. See *Patterson, supra* at 290-291.[23] Therefore, after formal adversarial proceedings have begun and the defendant asserts the right to counsel either at questioning or arraignment, "the police may not conduct further interrogations until counsel has been made available to the accused, unless the accused initiates further communications, exchanges, or conversations with the police." *Bladel, supra* at 66. This rule, as set forth in *Bladel* and affirmed by the United States Supreme Court in *Jackson, supra,* is intended to be a bright-line rule,

---

[23] In *Patterson,* the defendant did not request counsel and therefore did not invoke the right to counsel even though he was indicted. The Court held that indictment does not trigger the invocation of the right to counsel and therefore does not trigger the ban against further police questioning. *Id.* at 291.

with the only exception being a subsequent initiation by defendant. *Jackson, supra* at 634.

In the instant case, defendant was arraigned and invoked his right to counsel by requesting counsel at his arraignment.[24] In terms of falling within the exception set forth in *Jackson,* we agree that the factual findings below indicate that defendant technically "initiated" or asked to take a polygraph examination, but we are not persuaded that this initiation satisfies the requirements enunciated in *Jackson.* Indeed, defendant requested the examination *before* he was arrested or arraigned and, accordingly, before the bright-line rule in *Jackson* was triggered. Therefore, because defendant's Sixth Amendment right to counsel had not yet attached or been invoked, defendant's request for the polygraph examination could not fall within the *Jackson* exception.[25] Indeed, after being arraigned and requesting appointed counsel, the general prohibition against further police interrogation was invoked,[26] absent any subsequent initiation *and* waiver by defendant.[27]

Applying the bright-line rule in *Jackson* to the case at bar, it is clear that defendant did not initiate any further communication postarraign-

[24] Although we do not have a transcript of the arraignment, the record contains a form signed by defendant specifically requesting the appointment of counsel. Accordingly, there is no question that defendant invoked his right to counsel. Cf. *Montoya v Collins,* 955 F2d 279, 282-283 (CA 5, 1992).

[25] Accordingly, any communications made before the Sixth Amendment right to counsel had attached and been invoked—whether initiated by defendant or not—are irrelevant for purposes of the *Jackson* exception regarding whether he initiated further communications with respect to the Sixth Amendment right to counsel inquiry.

[26] While the record appears to be unclear whether Detective Gaultier knew of defendant's appointed counsel, *Jackson* makes clear that "[o]ne set of state actors (the police) may not claim ignorance of defendants' unequivocal request for counsel to another state actor (the court)." *Id.* at 634.

[27] See, e.g., *Smith v Illinois,* 469 US 91; 105 S Ct 490; 83 L Ed 2d 488 (1984).

ment. Instead, Detective Gaultier initiated contact with defendant by leaving the message at defendant's residence, unquestionably in anticipation of further police interrogation, i.e., the polygraph examination and questioning thereafter. Indeed, simply because defendant responded to this message with a desire to endure further questioning does not remedy this problem. *Id.* at 635, n 9. Thus, with the slate set clean by *Jackson,* we are persuaded that defendant did not initiate further communications and accordingly, the subsequent interrogation and admission by defendant in the patrol car violated defendant's Sixth Amendment right to counsel and should have been excluded.[28] We now turn to our harmless error analysis.

### III. HARMLESS ERROR

An error that violates the federal constitution obliges us to look to federal precedent for the harmless error rule. *Chapman v California,* 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967), and *Arizona v Fulminante,* 499 US 279; 111 S Ct 1246; 113 L Ed 2d 302 (1991).[29] The United States Su-

---

[28] In light of our finding that there is a violation of *Jackson,* it becomes unnecessary for us to determine whether defendant waived his right to counsel. As stated earlier, this is a two-step inquiry: (1) did defendant initiate further communication, and, if so, (2) did he waive his Sixth Amendment right to counsel. Failing the former, the Court need not consider the latter.

[29] The application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law. But the error from which these petitioners suffered was a denial of rights guaranteed [by the federal constitution] . . . . Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied. With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect

preme Court has set forth a two-part inquiry. First, a court must ask if the error is a "structural defect[ ] in the constitution of the trial mechanism, which def[ies] analysis by 'harmless-error' standards." *Fulminante, supra* at 309. These errors include the total deprivation of the right to trial counsel,[30] an impartial judge,[31] excluding grand jury members who are the same race as defendant,[32] denial of the right to self-representation,[33] denial of the right to a public trial,[34] and a constitutionally improper reasonable doubt instruction.[35] Upon finding any of these errors, a court must automatically reverse.

At the other end of the spectrum, however, are trial errors that "occur[ ] during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether

people from infractions by the States of federally guaranteed rights. We have no hesitation in saying that the right of these petitioners not to be punished for exercising their Fifth and Fourteenth Amendment right to be silent—expressly created by the Federal Constitution itself—is a federal right which, in the absence of appropriate congressional action, it is our responsibility to protect by fashioning the necessary rule. [*Chapman, supra* at 21.]

The Court actually formulated part of the harmless error test in *Fahy v Connecticut,* 375 US 85, 86-87; 84 S Ct 229; 11 L Ed 2d 171 (1963); however, it was never clear whether this was a federal harmless error rule or state harmless error rule. *Chapman* later confirmed that this is the federal harmless error rule and further defined the burden of persuasion needed to show the causal effect on the jury.

[30] *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963).

[31] *Tumey v Ohio,* 273 US 510; 47 S Ct 437; 71 L Ed 749 (1927).

[32] *Vasquez v Hillery,* 474 US 254; 106 S Ct 617; 88 L Ed 2d 598 (1986).

[33] *McKaskle v Wiggins,* 465 US 168, 177-178, n 8; 104 S Ct 944; 79 L Ed 2d 122 (1984).

[34] *Waller v Georgia,* 467 US 39, 49, n 9; 104 S Ct 2210; 81 L Ed 2d 31 (1984).

[35] *Sullivan v Louisiana,* 508 US —; 113 S Ct 2078; 124 L Ed 2d 182 (1993).

its admission was harmless beyond a reasonable doubt." *Fulminante, supra* at 307-308. This requires the beneficiary of the error to prove,[36] and the court to determine, beyond a reasonable doubt that there is no " 'reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman, supra* at 23.

While the instant error does not justify automatic reversal as a structural error that infects the entire trial mechanism, it is a trial error occurring during the presentation of the case to the jury and thereby subject to a harmless error analysis. Accordingly, applying the federal harmless error test, we do not find this error harmless beyond a reasonable doubt.

We reach this conclusion after examining the entire record and considering both the statement itself and its subsequent emphasis in closing argument. There is no doubt that a father in admitting that he is having sexual fantasies about his daughter is making an inculpatory and highly prejudicial admission. Realizing the probative value of this admission, the prosecutor capitalized on the admission in closing argument:

---

[36] The *Chapman* Court explained the burden of proof in the following manner:

Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment. There is little, if any, difference between our statement in *Fahy* [n 29 *supra*], about "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. [*Id.* at 24.]

> It's interesting, ladies and gentlemen. Detective Gaultier testified to you that when he was speaking with the defendant, the defendant admits to him he has sexual thoughts about his nine-year-old daughter. *That's a very specific descriptive term, sexual thoughts.* [Emphasis added.]

Considering the obvious prejudicial and inculpatory nature of this statement, the emphasis in closing argument, and the lack of other, admissible corroborating evidence in this credibility contest,[37] we cannot conclude beyond a reasonable doubt that this inadmissible evidence did not tip the scale in favor of the prosecution and contribute to the jury's verdict. Instead, we find it reasonable to believe that this evidence affected the jury's decision to convict.

### IV. CONCLUSION

Because we have concluded that the Sixth Amendment error independently requires reversal, we need not consider whether the admission of the hearsay statements[38] were also harmful.[39] Instead, we rely on the Sixth Amendment violation as the

---

[37] While credibility contests are not uncommon in criminal sexual conduct cases, *People v LaLone,* 432 Mich 103, 117; 437 NW2d 611 (1989) (BRICKLEY, J.); *People v Straight,* 430 Mich 418, 427; 424 NW2d 257 (1988), the wrongful admission of corroborating testimony "on either side could tip the scales" and result in harmful error. *People v Gee,* 406 Mich 279, 283; 278 NW2d 304 (1979).

[38] We note that defendant also attempted to frame this error as a constitutional error in violation of the federal Sixth Amendment Confrontation Clause. However, we find difficulty in concluding that defendant's confrontation rights were violated because the declarant testified and was available for cross-examination. See *Idaho v Wright,* 497 US 805; 110 S Ct 3139; 111 L Ed 2d 638 (1990); *People v Poole,* 444 Mich 151, 162-163; 506 NW2d 505 (1993). Regardless, however, we do agree that the testimony clearly violated our interpretation of MRE 803(4) in *LaLone, supra,* and must be avoided at retrial.

[39] Accordingly, we save for another day, after full briefing and argument, the distinction between, and the enunciation of, the consti-

basis for reversing the opinion of the Court of Appeals and remanding the case to the trial court for proceedings consistent with this opinion.

CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

tutional harmless error test and Michigan's *non*constitutional harmless error test.